Taylor, Chief-Justice.
The ij«cslions mude l>y the bill .1:1.! :> • r'.i'K, «íJuír l«> i';;1 r .be > ••••:, of a fora ir.» of yd’ land in Orange County, which it is Ellegrd v,as made by ilobhs, to Benjamin Cantrell, km con-in law, nnJ v.Iskh the widow of the laíü r (¿inco intermarried with the 'Dc'fuidant Browning) híw., kírccs his death, den-iroyed, op bow conceals. The Complainants are the children of Benjamin Cantrell asid tho Defendant SoT)liia, ami of Course, entitled h> the inheritance, it* ¡be leu; ever vested in tlieir father ; otherwise, it descended to Sophia, the Defendant, from her father Babbs, and she is still seised.
The witness mainly relied on, to prove that such a deed once existed, is Janies Yancey, the substance of •y«i¡ >se testimony is that on 6th February^ 1816 5 be, together with John IJenslw, met ai lite house of Benjamin Cantrell, dt ceased, for the purpose of taking an inventory of his estate 5 and in looking over tbs papéis, ho saw a deed of gifs; from Hobbs to Cantrell, for e¡;:;.¡„ or nine hundred acres of land in Orange County, of which, part was reserved to üobó’s widow daring her life j and the boundaries of this part as described in the deed, the witness stales. In various conversations he had with the Defendant, Sophia, after that time, she always said, she would, divide the Orange land equally among the children, in which she persisted until after her marriage with the other Defendant. This witness administered on Cantrell’s effects, and went to tho house after the Defendant’s marriage, to possess himself of the papers ; when, for some time, the Defen lau", doptiia, refused to let him have them, hut at length allowed him to look over part of them. There was a small bag full of papers, which she took up, saying it was her lather’s old papers, which she would suffer no one to have. When the sale took place, she said she still had these papers in a trunk, which was sold, after they were taken out. The witness does not recollect the date of tho *646 deed, but his imnrc.wion is, that it bore date in iñü, or jgQg he thinks there ".ere. two 'sul’-cribini? witnesses to it, but cannot remember who they were 5 be dnj not SiJi3cicnt!y notice the h ami writing of the body of t be deed to recognize it ; but the execution was in the hand - writing of Robbs, of which he has no other knowledge, Nun irons seeing papers signed by him (as the defend ¿ut, Sophia, told !•;•-:) among the. papers of Cantrell, and ire signature ivas in an indifferent, clumsy, old Í a-implied band. Ho road ibis deed over, in the presence of John Menslee, now deceased, Y> illkm Cantrell am! the IMeiukuii, Sophia, audibly, to enable (ho first r<;«ne;l person to take do.ui -.it number of acres, to the end of ascertaining each child’s sisare, which was compared at 200 acres. After . the deeds, they were returned to the Befe :u..i , Cookie, who pat. them in a small bag, which was deposkvd in a trunk, which bag be thinks was the sanie, which Sophia withheld when he went to get the pyw-rs of the estate, saying, they were the papers of her £,i.he.;y which no one should lane. fie had a conversation with Sophia, the day after the inventory was taken- concerning her dower, when abo expressed a preferente for tire lands in Orange, and a residence- then* | but'¿pon the witness recommending to her rather to bo endowed of the lands in Caswell, she replied, she would. think of it. Afterwards, ‘when h'T daughter was married, Sophia told him she would follow his advice as to her dower, and that the land in Orange, and the rest in Caswell, should be divided amongst her children. She did not, either when the deed was read, or at any other time till her marriage, set up a claim to the land in Orange. On further reilcclion, the witness thinks the «iced was executed with the name of Alexander Robbs and a m 1. ktnade, he tninks an “/¿.w
William Gañirsll, was present at the time, and heard Taim-j read a deed, who, Cj on the witness asking him wJna iio wan reading, said, it was a deed from dkjcmi- *647 dcr Robbs to Benjamin Cantrell; but the witness does not .know from v hat he heard of the reading, where the land lay, whether Yancey read the deed through or not, nor does he recollect any thing that was read. This was the first knowledge lie had of the existence of such an instrument of writing.
TJrs evidence is opposed by the Defendants; first, by Solomon Parks, who says that a short time before Cantrell’s death, he came to his house to borrow money, and remarked, that he would have sold some land that lay in Orange County toFomiile, but that his wife was not willing. The witness replied, why is that an obstacle? for if it belongs to your wife it is your'property ; Cantrell said, that is not the case, it is her’s, conveying to the mind of the witness, that it liad descended from her father Hobbs. During the widowhood of Sophia, she came to the witness’s house, who being under the impression thus made, ad\ised her to take her dower in Caswell, and to consult with a lawyer.
Some time afterwards, the deponent requested the witness Yancey to come to his house upon business, ami in the course of conversation concerning the estate of Cantrell, asked him, if he bad inventoried the lands in Orange as part of the estate, and upon his saying yes, the witness asked how that could be, as he understood the land belonged to the widow'. Yancey replied, lha be had seen among Cantrell’s papers, a deed for those lands from Robbs to Cantrell ; and upon being further asked who was the subscribing .witness, answered, there was none to the deed. This conversation took place iu the spring of 1817, and Yancey’s deposition wTas taken in September following. Alexander Vincent says, lie was present when Yancey was looking over Cantrell’s papers, and sat within five feet of him, and thinks be heard, some papers read by him audibly, but none conveying title from Robbs to Cantrell.
Richard Jones, had access to all Cantrell’s papers da- *648 rJtln- }fls life-time, and not long before bis death ; that he brought a trunk to the witness’s house containing papers, who read them for him ; they were deeds from dif-feren^ j)ersons to A. Robbs, but not one from Robbs to Cantrell. Cantrell confided much in this witness, often spoke to him about his affairs, constantly spoke of the Oraiige lands as his wife’s, which ho said he would sell, and move away, if she consented. Even when the widow of Robbs was petitioning for dower out of them, he mentioned them by no other description than as his wife’s.
William Dickey and Jamies Fawcett, were called upon to take an inventory of Robbs’ property, after his death, they examined a trunk containing his papers, chiefly deeds to him, but saw no conveyance from Robbs to Cantrell, whom they never heard claim the Orange land, otherwise than in right of his wife.
Hardy Hurdle, ivas much in the confidence of Robbs, who was an illiterate man, and got the witness to arrange his papers, and sometimes to write for him. Robbs said, he could not make a will to please his wife, unless he left bis property at her ’disposal ; that the law would make a will for him, and he desired Cantrell to be his heir, at the same time taking a trunk and key and delivering it to him as his property ; this trunk contained val liable papers, and the witness thought Robbs meant, by this act, to give all the right he could to Cantrell.
William Bronnich, was intimately acquainted and connected with Cantrell and Robbs, whom he has often heard conversing about, the land in Orange, but never understood from them that Cantrell had any other claim than in right of his wife, whom Robbs said it would devolve upon, as his heir at law. After the death of Robbs, when the widow petitioned for dower, in the Orange land, Cantrell opposed no claim against her.
Thomas Shanks, heard Cantrell trying to persuade his wife to sell part of the land to Fonville, who would not *649 agree to it, unless Fonvillc would take the whole, not-vvil hstamling Cantrell’s urging his want of money.
Frederick Fonvillc, offered to buy the land from Cantrell and Isis wile, telling Cantrell he had only a life estate, to which he answered he knew it was his wife’s. Cantrell was pressed for money and would have sold the land, could he have got his wife to join in the conveyance.
M. Jones, heard the Defendant, Browning, say something about his wife's snatching some papers from Mr. Yancey, some night when they were looking over papers, and said there had been such papers seen, but they would never be seen again he reckoned 5 and,
John West says, that Browning was at his house, oiks Sunday, and said the opposite party had been saying something about papers being snatched, but as for his part he. knew nothing of it.
This is the substance of the evidence on which the Court has to decide, whether a deed was made to Benjamin Cantrell by his father-in-law Alexander Hobbs, and whether it has been suppressed or concealed by the Defendants. The first observation that occurs is, that as the Defendants distinctly and positively deny that such a deed ever existed, or that they have destroyed or concealed it, the Court must place as much confidence on the consciences of the Defendants, as on the, testimony of a ¡single witness ; unless íbero be some circumstances in the case to invest the latter wiih a superior degree of credit. If there be any one circumstance to overbalance the credit of the denial, it is admitted that a Court of Equity will decree upon the testimony of one witness. A patient examination of the evidence will, i think, shew that all the circumstances throw additional weight into the scale of the answer, and that none of them tend to confirm and strengthen the testimony of Mr. Yancey.
His recollection of the manner in which the deed was executed is vague and unsatisfactory; he at first thought *650 ft Was in a clumsy, old-fashioned hand, and that he be» lieved if. to be Robbs’ from its resemblance to other signatures, which his daughter told him were his. Upon farther reflection, he {bought it was signed only with the letter “ I?.” A particular description of the character of a hand-writing, seems to be consistent only with a distinct remembrance of it; and an impression that it was clumsy and old-fashioned, does not seem likely to have been made on the mind by the inspection of a single letter made by a man who could, perhaps, make no other. The deposition was made in September, 1817; the reading of the deed occurred in February, 1816, an interval of time in which the remembrance of so important a circumstance as the execution of a deed, on which depended the title of sixteen hundred acres of land, would not, in ordinary cases, he effaced. But the boundaries of the part reserved to Robbs’s wife, were accurately remembered. The date was not remembered, but the witness thought it bore date in 1807, or 1809, which is impossible if it were a genuine deed, for several witnesses have deposed that Robbs died in 1805. When the deposition was taken, the witness thought there were two subscribing witnesses to the deed ; but in the spring of the same year, in a conversation with Parks, he said there were none. From this witness’s deposilion the only inference I make is, that the circumstance is too indistinctly remembered by him, and too inconclusively proved to authorise any Court, even if there were no answer on oath, to take away the Defendant’s inheritance.
Nor does this evidence derive any support from Cantrell, the only other witness now alive, who was present on the occasion. He did hear Yancey read a deed, but from the reading he knew not what deed it was, or what land it was made for ; Yancey told him, upon being asked, the nature of the deed •, and that must still depend upon Yancey’s testimony.
*651 If such a deed had existed, it is scarcely credible that neither Robbs nor Cantrell should have mentioned it to some of those persons upon whom* ooth being illiterate men, they had such frequent occasion to rely for the transaction of the most common business $ that it should not have been seen by any in the life-time of Robbs, nor after his death when all his papers were given over to Cantrell, who exposed them to Richard Jones, a short time before his death. Ami what motive could exist for making such a conveyance ? The Defendant, Sophia, was the only child of Robbs, who made no secret of hid resolution to die intestate, on account of the difficulty of making such a will as would be satisfactory to his wife, uniformly declaring that Cantrell should be his heir, and on one occasion delivering to him all his valuable papers.
The conduct of Cantrell, in the latter years of bin life, is utterly irreconcilable with the belief that such a conveyance, was made. Repeatedly suffering under pecuniary pressure, which he had an opportunity of removing by the sale of the Orange land, he constantly asserted, and acted upon the belief, that it belonged to his wife, whom lie urged, but in vain, to join in the sale of part.
The widow of Hobbs claimed dower in the very land, and filed a petition for it, yet instead of asserting his title from her husband, or in any vvay obstructing her claim, though fully apprised of it, he passively acquiesced, and suffered the dower to be assigned.
1 do not think that any rational inference can be drawn from the claim or belief of the Defendant, Sophia, one way or the other. All the parties seem to be sufficiently uninformed, and she, perhaps, was not the wisest among them. She might think, from her father’s declarations, that her husband inherited the land from him, and at the same time believe that he could not sell it, without her joining in the sale, while she might also *652 think, as she seems to have done until her second marriage, that she was entitled only to dower, upon the death of Cantrell. The speculations or delusions of a AVoman, ignorant of her rights, can afford no safe ground for the judgment of a Court.
I have laid no stress upon the testimony of Vincent„ because I do not ascertain, upon looking into the deposition, that he was present on the occasion spoken of by Yancey, who says it was about the 6th, whereas Vincent speaks of a reading on the 9th. It is possible that they speak to different meetings, and therefore safer to omit it altogether. Nor have I noticed the testimony of E. Jones and .7. West, as I cannot connect it with any other part of the evidence, except the taking up of the bag spoken of by Yancey. If they were Robbs’s papers, Sophia had a right to them, and any inference that the deed was in it, must depend upon the foundation that its existence was sufficiently proved.
Upon the whole, my opinion is, that the bill be dismissed with costs.